**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
ROBERT LEVITT for himself and as custodian
for Richard Levitt and Monica Levitt, STEPHEN
G. SIBEN, PHILIP C. VITANZA for himself
and Elizabeth Vitanza and Luke Vitanza, JOHN
T. WHITE, GUY V. WOOD, and TED M. and
KATHRYN N. JONES, as Trustees,

                      **MEMORANDUM OF**
                      **DECISION AND ORDER**
                      99-CV-2789 (ADS) (AKT)

                              Plaintiffs,

             -against-

J.P. MORGAN SECURITIES INC. and J.P.
MORGAN CLEARING CORP.,

            Defendants and Third-Party Plaintiffs,

             -against-

RANDOLPH PACE, ALAN NOVICH, ADAM
R. LIEBERMAN, WARREN SCHREIBER,
JUDAH WERNICK, MICHAEL KRASNOFF,
NANCY G. SHALEK, CRAIG L.
KELLERMAN, WILLIAM E. SCUTERI,
MATTHEW HAWLEY, and ROBERT J.
PAULSON,

                 Third-Party Defendants.
---------------------------------------------------------X

**<u>APPEARANCES:</u>**

**Leslie Trager, Esq.**
*Attorney for the Plaintiffs*
230 Park Ave, 10th Floor
New York, NY 10169

**Arnold & Porter LLP**
*Attorneys for the Defendants and Third-Party Plaintiffs*
399 Park Avenue
New York, NY 10020
      By:    Michael D. Schissel, Esq.

1

Peter L. Zimroth, Esq.
Stephen M. Sacks, Esq.
Anthony D. Boccanfuso, Esq.
Kerry Ann Dziubek, Esq., Of Counsel

**Friedrich & Friedrich, LLC**
*Attorneys for the Third-Party Defendant Alan Novich*
5 Plume Grass Way
Westhampton, NY 11977
      By:   David B. Friedrich, Esq., Of Counsel

**Certilman, Balin, Adler & Hyman, LLP**
*Attorneys for the Third-Party Defendant Warren Schreiber*
90 Merrick Avenue
East Meadow, NY 11554
      By:   Martin P. Unger, Esq.
               Thomas J. McNamara, Esq., Of Counsel

**Law Offices of Bradley S. Gross**
*Attorneys for the Third-Party Defendant Michael Krasnoff*
90 Maiden Lane, 4th Floor
New York, NY 10038
      By:   Bradley Stewart Gross, Esq., Of Counsel

**Hughes Hubbard & Reed LLP**
*Attorneys for the Third-Party Defendant Nancy G. Shalek*
One Battery Park Plaza
New York, NY 10028
      By:   Jason Andrew Masimore, Esq.
               Lisa Ann Cahill, Esq., Of Counsel

**Randolph Pace**
*Third-Party Defendant Pro Se*
132 Dune Road
Westhampton Beach, NY 11978

**Adam R. Lieberman**
*Third-Party Defendant Pro Se*
1072 Madison Avenue
Lakewood, NJ 08701

**Judah Wernick**
*Third-Party Defendant Pro Se*
344 Grant Avenue
Woodmere, New York 11598

**William E. Scuteri**
*Third-Party Defendant Pro Se*
12505 U.S. Grant Ct.
Sportylvania, VA 22553

**Matthew Hawley**
*Third-Party Defendant Pro Se*
43 Conklin Avenue
Cortlandt Manor, NY 10567

**Robert J. Paulson**
*Third-Party Defendant Pro Se*
31 Paquatuck Avenue
East Moriches, NY 11940-1205

<u>**NO APPEARANCE:**</u>

Craig L. Kellerman

**SPATT, District Judge.**

In this securities fraud civil action, the Plaintiffs Robert Levitt, for himself and as custodian for Richard Levitt and Monica Levitt; Stephen G. Siben; Philip C. Vitanza, for himself and Elizabeth Vitanza and Luke Vitanza; John T. White; Guy V. Wood; and Ted M. and Kathryn N. Jones, as Trustees (collectively the "Plaintiffs") assert four causes of action against the Defendants J.P. Morgan Securities Inc. and J.P. Morgan Clearing Corp. (collectively, the "Defendants"), formerly Bear Stearns & Co. Inc. and Bear Stearns Securities Corp. (collectively, "Bear Stearns"). Their four claims arise in connection with a fraudulent scheme perpetrated by Sterling Foster & Co. ("Sterling Foster"), a brokerage firm, to manipulate the market for ML

3

Direct Inc. ("ML Direct") securities during and after ML Direct's initial public offering ("IPO") in 1996.

In this regard, the Plaintiffs allege that Bear Stearns (1) participated in the fraudulent scheme with Sterling Foster in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; (2) made knowingly false statements in violation of § 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; (3) exercised control over Sterling Foster so as to be liable as a control person under § 20(A) of the Securities Exchange Act, 15 U.S.C. § 78t(a); and (4) participated in and aided and abetted Sterling Foster's fraudulent scheme in violation of New York State common law.

Presently pending before the Court is (1) the Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 and (2) the Plaintiffs' cross-motion for summary judgment pursuant to Fed. R. Civ. P. 56. For the following reasons, the Defendants' motion for summary judgment is granted and the Plaintiffs' cross-motion for summary judgment is denied.

## I. BACKGROUND

The Court assumes that the parties are familiar with the background of this case. Accordingly, the Court will only repeat those facts relevant to resolve the motion and cross-motion for summary judgment.

### A.  Sterling Foster and Bear Stearn's Agreement

In April of 1994, Sterling Foster, an introducing broker, entered into an agreement with Bear Stearns under which Bear Stearns would serve as Sterling Foster's clearing firm, also

known as a clearing broker. Generally, introducing brokers are responsible for soliciting customers; recommending the purchase or sale of securities to customers; and monitoring customers' transactions. On the other hand, clearing brokers provide various services such as processing; settling and clearing securities transactions; and preparing trade confirmations and account statements for introducing brokers' customers.

In an earlier opinion in this case, the Second Circuit provided an instructive overview of the role that clearing brokers and introducing brokers play in the securities industry:

> A clearing firm clears trades, i.e., completes transactions by delivering securities to the purchasing broker-dealer and by making money payments to the selling broker-dealer. Clearing responsibilities include: receiving or delivering funds from or to the customer; maintaining records that reflect the transaction; and safeguarding the funds in the customer's account. A clearing firm is also responsible for maintaining records of all trades made by the customer, including sending confirmations, monthly statements, and dividends to the customer/investor. Additional clearing services include the extension of credit for the purchase of securities on margin. Small brokerage firms, commonly referred to as "introducing firms," typically lack sufficient capital, back office technology and personnel to "self clear." As a result, they enter into "carrying agreements" with clearing firms to out source clearing and other services. In addition to performing clearing functions, on occasion, the clearing firm executes transactions, thereby limiting the role of the introducing broker to simply soliciting investor sales. The clearing firm also provides name recognition for the introducing firm, frequently inflating the image of a small, unknown introducing firm. The name Bear Stearns, for example, lends credibility, stability, business savvy, and expertise to unknown introducing firms.

Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 97–98 (2d Cir. 2003) (internal citations and quotation marks omitted) (hereinafter, "Levitt I").

Bear Stearns acted as Sterling Foster's clearing broker until March 27, 1997, and was Sterling Foster's clearing broker at all relevant times to this case. During this period, Sterling

Foster engaged in several market manipulation schemes in connection with six separate public offerings, including the ML Direct IPO, which is the subject of the present lawsuit. The parties dispute the extent of Bear Stearns knowledge with respect to Sterling Foster's other fraudulent conduct prior to the ML Direct IPO.

**B.  Sterling Foster's Market Manipulation Scheme In Connection with the ML Direct IPO**

The ML Direct IPO occurred in September of 1996. The Prospectus for the ML Direct IPO (the "Prospectus") stated that shares would be issued in 480,000 units consisting of two shares of common stock and one common stock purchase warrant. The issue was priced at $15 per unit, so that the price per share at the offering was approximately $7.50. The IPO was underwritten by Patterson Travis, Inc. ("Patterson Travis").

The Prospectus also disclosed that certain ML Direct insiders, referred to as "Selling Securityholders," owned 2.4 million shares of ML Direct common stock at the time of the offering. Pursuant to a "lock-up" agreement that was disclosed in the Prospectus, the Selling Securityholders agreed not to sell their shares in the twelve months following the IPO unless they received permission to do so from Patterson Travis. In particular, the Prospectus stated that Patterson Travis had "no agreements or understandings with any of the Selling Securityholders with respect to release of the securities prior to the [expiration of the lock-up period] and ha[d] no present intention of releasing any or all of such securities prior to [the expiration of the lock-up period]."  (Dziubek Decl., Exh. P.)

The Prospectus became effective on September 3, 1996 and trading began the following day, September 4, 1996. On that day, September 4, 1996, Sterling Foster bought almost 1.1 million shares of ML Direct common stock, which included 255,000 units and 566,825 shares of

6

ML Direct common stock.  This apparently caused the price of the ML Direct stock to rise to $15.25 per share by the close of trading that day.

Also on September 4, 1996, Sterling Foster sold almost 3.9 million shares of ML Direct to its customers at approximately $13.50 to $14.50 per share, with an average of $14.10 per share.  Given that there were only 1.1 million shares for sale in the IPO, most of which Sterling Foster had purchased, Sterling Foster had sold approximately 2.86 million shares more than it actually owned.  In taking this short position of 2.86 million shares, Sterling Foster was confronted with a problem: the only other available ML Direct shares by which they could cover their position were held by the Selling Securityholders and these shares were subject to the lock-up agreement.  Moreover, because the ML Direct stock had risen to $15.25 by the close of trading on September 4, 1996, Sterling Foster would have had to pay over $43.69 million in order to cover its short position at the market price.

However, it seems Sterling Foster already had a remedy for this situation.  In this regard, prior to the effective date of the IPO, September 3, 1996, and the opening of the after market, Sterling Foster and Patterson Travis entered into an undisclosed arrangement, under which Sterling Foster would purchase the Selling Securityholders shares after the offering at a below market price of $3.25 per share in order to cover Sterling Foster's short position.  The Prospectus did not disclose this pre-existing arrangement to release the Selling Securityholder shares much earlier than the twelve-month lock-up agreement suggested.

Sterling Foster was required to deliver the shares it sold on September 4, 1996 to Bear Stearns by September 9, 1996 in order to cover its short position.  Sterling Foster failed to deliver the shares by that date.  Nevertheless, on September 10, 1996, Patterson Travis released

7

the Selling Securityholders from their lock-up agreements and, pursuant to the undisclosed agreement, Sterling Foster purchased their shares at $3.25 per share. Sterling Foster's president, Adam Lieberman ("Lieberman"), caused these shares to be delivered to Bear Stearns on September 11 and 12, 1996, and directed Bear Stearns to pay the Selling Securityholders $7.8 million, thereby covering its short position. When Sterling Foster covered its short position, it made a 400 percent underwriting profit consisting of the difference between the price at which it sold the shares to the public ($13.50 to $14.50 per share) and the price it paid to the Selling Securityholders ($3.25 per share).

Thus, the offering documents led the investing public, including Sterling Foster's customers, to believe that only 1.1 million shares of ML Direct were being offered when, in fact, 3.9 million shares were being offered. Investors also believed that the market had set the price of $13 to $15 per share when, in actuality, that price had been artificially created by Sterling Foster, which was at the same time purchasing shares from the Selling Securityholders at only $3.25 per share.

Eventually, numerous individuals involved with Sterling Foster pled guilty to criminal fraud relating to trading in ML Direct, as well as other securities. These individuals included Lieberman; Randolph Pace ("Pace"); Alan Novich ("Novich"); Michael Krasnoff ("Krasnoff"); Warren Schreiber ("Schreiber") and Judah Wernick ("Wernick"), who are Third-Party Defendants in this action.

## C.  Bear Stearns' Role in the ML Direct IPO

Before agreeing to clear trades for introducing brokers such as Sterling Foster, Bear Stearns required introducing brokers to seek permission to act as an underwriter before it would

clear the trades.  As a result, prior to August 20, 1996, Sterling Foster requested that Bear

Stearns permit Sterling Foster to underwrite the sale of the Selling Securityholder shares.  In this

regard, apparently Lieberman informed Keith Brigley ("Brigley"), an associate at Bear Stearns,

that Sterling Foster intended to take a substantial short position in its Bear Stearns trading

account, which would be covered by shares of the Selling Securityholders.   However,

Lieberman testified that "[b]ecause the [P]rospectus didn't  allow [Sterling Foster] to have a

prearrangement to buy the securities before the offering[,] [ ] [he] [did not] know if [he] was

explicit with Bear Stearns to let them know that there was already an arrangement in place to buy

the stock."  (Dziubek, Exh. B.)   The parties dispute whether Brigley shared the information

about the short position with anyone at Bear Stearns.

In addition, before the IPO, Brigley received a copy of the ML Direct IPO Prospectus,

which contained the lock-up agreement discussed above.  He sent copies of the Prospectus to

Ken Callanan ("Callanan") and Peter Murphy ("Murphy"), officers of Bear Stearns.  The

Plaintiffs claim that as a result, Bear Stearns knew that the representations made concerning the

lock-up were false, since they had allegedly been advised by Sterling Foster of its intent to

purchase the Selling Securityholder shares.  However, the Defendants point out that Brigley

testified at his deposition that he did not recall whether he read the lock-up agreement contained

in the Prospectus.

In addition, the Plaintiffs point out that Bear Stearns sent Sterling Foster's customers that

purchased ML Direct stock misleading confirmations in that they failed to disclose that Sterling

Foster was making a 400 percent profit on the transactions.  According to the Plaintiffs, Bear

Stearns received between $12 and $25 for each trade of ML Direct by Sterling Foster that it cleared.

**D.  Procedural History**

In 1997, shareholders of ML Direct and several other issuers commenced five lawsuits against Sterling Foster and other defendants in the Eastern District of New York and elsewhere. In October of 1997, these five suits were consolidated into one action by United States District Court Judge Denis Hurley.  The amended and consolidated complaint in Rogers v. Sterling Foster & Co., Inc., et al. (the "Rogers action") was filed in the Eastern District of New York against Sterling Foster and several other defendants.

 In February of 1999, this Court granted the Rogers Plaintiffs' motion to add Bear Stearns as a defendant.  In April of 1999, the Multidistrict Litigation Panel transferred the present action, Levitt v. Bear, Stearns & Co. Inc. and Bear, Stearns Securities Corp. (the "Levitt action"), from the United States District Court for the Southern District of New York to the consolidated pre-trial proceeding in this Court.  As indicated, the Levitt action concerns securities fraud allegedly committed by Bear Stearns in connection with ML Direct's IPO.

On October 31, 2006, over the objections of the Levitt Plaintiffs, the Court granted final approval of a settlement in the Rogers action. The Levitt Plaintiffs appealed and on December 18, 2007, the United States Court of Appeals for the Second Circuit, among other rulings, vacated the Court's order approving the parties' proposed settlement.  Levitt v. Rogers, 257 F. App'x 450 (2d Cir. 2007) (hereinafter, "Levitt II").  Specifically, the Second Circuit found that (1) after all claims against Bear Stearns by plaintiffs other than the ML Direct class and the Applewoods class, which alleged a fraudulent scheme related to Applewoods, Inc.'s IPO, were

time-barred, the <u>Levitt</u> Plaintiffs had the largest financial interest in the outcome of the case; (2) it would have been appropriate for this Court to appoint the <u>Levitt</u> Plaintiffs as lead plaintiffs at that time; (3) the settlement was not fair because there was insufficient evidence of Bear Stearns' wrongdoing; and (4) further discovery was necessary "to provide the parties and the court with information sufficient to make a determination regarding whether the proposed settlement is fair and reasonable," particularly as "certain representatives from Sterling Foster, who [had] [ ] been convicted of crimes, [would] be able to provide additional substantive information regarding the allegations against Bear Stearns." <u>Id.</u> at 454.

On June 24, 2010, this Court granted in part and denied in part the Plaintiffs' motion for class certification pursuant to Fed. R. Civ. P. 23. In their motion, the Plaintiffs asked the Court to certify a class of "all persons who purchased ML Direct common stock or warrants during the period September 4, 1996 through February 18, 1998 ('Class Period') and who lost money on such purchases," so that they could pursue their claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. The Court granted class certification with respect to the § 10(b) claims but denied it as to the § 20(a) claim. The Defendants moved for leave to file an interlocutory appeal of the Court's June 24, 2010 Order, which was granted by the Second Circuit on November 10, 2010.

On March 15, 2013, the Second Circuit issued a decision reversing this Court's grant of class certification in the June 24, 2010 Order and remanding for further proceedings consistent with its opinion. The Second Circuit explained:

> The <u>Levitt</u> Plaintiffs have not adduced any evidence at the class certification stage that indicates that Bear Stearns directed or instigated sham or fraudulent trades, or that it otherwise so departed from the performance of normal clearing functions as to

> establish that Bear Stearns owed Sterling Foster's customers a duty
> of disclosure. Without a duty of disclosure, Bear Stearns could not
> have engaged in a material omission, [the] Plaintiffs cannot
> employ a classwide presumption of reliance under <u>Affiliated Ute</u>;
> nor, therefore, can [the] Plaintiffs satisfy the predominance
> requirement of Rule 23(b)(3). The district court accordingly erred
> in certifying a (b)(3) class.

<u>Levitt v. J.P. Morgan Securities, Inc.</u>, 710 F.3d 454, 470 (2d Cir. 2013) (hereinafter, "<u>Levitt III</u>").

Following the issuance of the Second Circuit's March 15, 2013 decision, on May 22, 2013, the Court directed the parties to appear for a status conference on June 5, 2013. At the June 5, 2013 conference, the Court set a briefing schedule for the Defendants' motion and the Plaintiffs' cross-motion for summary judgment. No additional discovery was conducted and the summary judgment record is substantially similar to the evidentiary record before the Court when it considered the Plaintiffs' motion for class certification.

The Defendants moved for summary judgment on all of the Plaintiffs' four claims, which, to reiterate, were (1) a market manipulation claim pursuant to § 10(b) of the Securities Exchange Act of 1934; (2) a misrepresentation or omission claim pursuant to §10(b) of the Securities Exchange Act of 1934; (3) a control person liability claim pursuant to § 20 of the Securities Exchange Act of 1934; and (4) a New York State common law fraud claim. However, in opposition to the Defendants motion and in support of their own cross-motion, the Plaintiffs conceded that after the Second Circuit's decision in <u>Levitt III</u>, "there remain two claims of the individual [P]laintiffs: 1. [the] Defendants violated New York law by aiding and abetting Sterling Foster's fraud. 2. [the] Defendants violated [§] 10(b) of the Securities Exchange Act [of 1934] by making false representations on the confirmations to the [P]laintiffs." (Pl. Mem., pg. 4.) The Plaintiffs make no attempt to address the Defendants arguments as to why they are

entitled to summary judgment on the Plaintiffs' § 10(b) market manipulation and § 20 control person liability causes of action.

As such, given the Plaintiffs' own admission and failure to even discuss their § 10(b) market manipulation or § 20 control person liability claim, the Court need not evaluate either of these causes of action and dismisses them as abandoned by the Plaintiffs.  See Tagliatela v. Metro-N. Commuter R. Co., 310-CV-1755 VLB, 2012 WL 5493618, at *7 (D. Conn. Nov. 13, 2012) ("It is well established that '[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'") (quoting Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (collecting cases) (internal brackets in the original); Gaston v. City of New York, 851 F. Supp. 2d 780, 796 (S.D.N.Y. 2012) ("[The] [d]efendants moved for summary judgment on those claims, but [the plaintiff] failed to respond or even mention these claims in his opposition brief to [the] defendants' summary judgment motion.  Therefore, these claims are dismissed as abandoned.") (collecting cases) (citations omitted); Ostroski v. Town of Southold, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) ("Because plaintiff's opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone.") (collecting cases).

Accordingly, the only remaining causes of action are the § 10(b) misrepresentation or omission claim and the New York State common law aiding and abetting fraud claim.  The Court will now proceed with its analysis of these claims.

## II. DISCUSSION

### A. Legal Standard

It is well-settled that summary judgment under Fed. R. Civ. P. 56 is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. Matsushita, 475 U.S. at 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994)

(citations omitted).  "[T]he trial court's task at the summary judgment motion stage of litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to decid[e] them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Id. at 1224.

## B. As to the Plaintiffs' Securities Exchange Act § 10(b) Misrepresentation or Omission Claim

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 prohibit fraudulent activities in connection with securities transactions.  Specifically, section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b–5 describes certain types of behavior proscribed by the statute, including:

> [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .

17 C.F.R. § 240.10b–5.

"To sustain a claim under Section 10(b) and Rule 10b–5, the [P]laintiffs must show '(i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance by the [P]laintiff(s); (v) economic loss; and (vi) loss causation.'" CILP Associates, L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 122 (2d Cir. 2013) (quoting Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 158 (2d Cir. 2012)); see also In re Pfizer Inc. Sec. Litig., 936 F. Supp. 2d 252, 260 (S.D.N.Y. 2013) ("To establish a Section 10(b)

violation, Plaintiffs must prove the following: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" (quoting <u>Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.</u>, 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008)). In addition, as the Second Circuit pointed out in <u>Levitt III</u>, "for an omission to be considered actionable under § 10(b), the defendant must be subject to an underlying duty to disclose." <u>Levitt v. J.P. Morgan Sec., Inc.</u>, 710 F.3d 454, 465 (2d Cir. 2013) (citing <u>Basic v. Levinson</u>, 485 U.S. 224, 239 n.17, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); <u>In re Time Warner Inc. Sec. Litig.</u>, 9 F.3d 259, 267 (2d Cir. 1993)).

In this case, the Plaintiffs contend that the confirmations that Bear Stearns sent them contained material misrepresentations in that they failed to disclose that Sterling Foster had made a 400 percent profit when they sold them the ML Direct stock. In this regard, they claim the confirmations show a markup of zero percent even though Sterling Foster's profit was 400 percent. However, their argument fails for at least two key reasons.

First, while the Plaintiffs try to present the confirmations as containing material misrepresentations, in the Court's view, they are more properly characterized as containing omissions. In this regard, contrary to the Plaintiffs' suggestion, the confirmations do not affirmatively show a markup of zero percent. Rather, the confirmations show that the difference between the price that the Plaintiffs bought each stock and the market price of the stock was $0.00. This is not a misrepresentation, but an accurate statement concerning the purchase price that the Plaintiffs paid for the stock and the price of the stock in the market, even if the market

price was artificially inflated by Sterling Foster purchasing almost all of the 1.1 million stocks on September 4, 1996.

Moreover, nowhere on the confirmation is there any information concerning how much Sterling Foster bought the stock for from the Selling Securityholders or whether Sterling Foster made a profit from the sale. Thus, because the confirmations make no statements at all with respect to the price Sterling Foster paid for the stock or its profit, the lack of disclosure concerning Sterling Foster's 400 percent profit cannot be said to be a misrepresentation in the confirmations, but is instead an omission. See,e.g., Yu v. State St. Corp., 08 MDL 1945, 2010 WL 2816259, at *2 (S.D.N.Y. July 14, 2010) ("[T]he allegations did not suggest that the percentage tables were actually false. . . .[The] [p]laintiff's real claim seemed to be one of omission: because [the] defendants disclosed that a certain type of mortgage-related security represented a relatively small percentage of the portfolio–11.3% in 2006, 13.8% in 2007–it was misleading not to disclose that mortgage-related securities as a whole represented a larger percentage of the portfolio.").

Recognizing that the Plaintiffs' claim involves an omission instead of a misrepresentation, the Court is obliged to follow the Second Circuit's holding in Levitt III. The Second Circuit in Levitt III explained that "a clearing agent [ ] is generally under no fiduciary duty to the owners of the securities that pass through its hands." 710 F.3d at 456–66 (quoting Edwards & Hanly v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 484 (2d Cir.1979)) (internal brackets in original). Consequently, "where a clearing broker was simply providing normal clearing services, district courts have declined to 'impose [ ] liability to the clearing

broker for the transgressions of the introducing broker.'" Id. at 466 quoting Fezzani v. Bear, Stearns & Co., 592 F. Supp. 2d 410, 425–26 (S.D.N.Y. 2008) (hereinafter "Fezzani I")).

After laying this framework, the Second Circuit concluded, based on substantively the same evidentiary record, that "the Levitt Plaintiffs have failed to allege sufficiently direct involvement by Bear Stearns in Sterling Foster's scheme to manipulate the ML Direct IPO to create any such duty owed by Bear Stearns to Sterling Foster's customers. And absent a duty to disclose, there can be no material omission under § 10(b)[.]" Id. at 467–68. In this regard, as they do here, "the Levitt Plaintiffs [ ] attempted to show that Bear Stearns did more than simply clear trades [by][,] in particular, [ ] offer[ing] expert testimony that Bear Stearns' activities in connection with the ML direct IPO were 'irregular." Id. at 468. However, the Second Circuit rejected "[t]hese arguments [as] unavailing." Id.

Of importance, the Second Circuit specifically addressed the Plaintiffs' complaints concerning the omissions in the confirmations and found them lacking:

> The Levitt Plaintiffs next assert that the statements on the trade confirmations issued by Bear Stearns to Sterling Foster customers who purchased shares of ML Direct in the IPO contained misleading statements. The confirmations contained boilerplate language indicating that Sterling Foster "makes a mkt [market] in this security [i.e., ML Direct], and acted as principal." Bear Stearns responds that the trade confirmations were automatically populated by Bear Stearns with data imputed by Sterling Foster. [The] [p]laintiffs do not contradict this assertion on appeal. Instead, they argue that Bear Stearns had a duty to correct Sterling Foster's misrepresentation. This conduct standing alone, however, does not constitute the sort of extraordinarily high involvement in the fraudulent scheme necessary to create such a duty on the part of Bear Stearns.

Id. at 468–69.

Having reviewed the summary judgment record and guided by the Second Circuit's decision in <u>Levitt III</u>, the Court finds that the Defendants are entitled to summary judgment as a matter of law with respect to the Plaintiffs' § 10(b) claim for material misrepresentation or omission. The undisputed facts before the Court are that Bear Stearns only generated the confirmations after Sterling Foster entered the price information for the ML Direct transactions. As the Second Circuit held, since Bear Stearns was only a clearing broker, it had no duty to Sterling Foster's clients to correct any omissions contained in the confirmations and, therefore, cannot be held liable under § 10(b) of the Securities Exchange Act of 1934.

Second, even assuming that Bear Stearns did have a duty to disclose to the Plaintiffs Sterling Foster's omissions, the Plaintiffs' § 10(b) misrepresentation claim would still fail as a matter of law because there is no evidence that the Plaintiffs relied on the confirmations. "Reliance is an essential element of a securities fraud action because it 'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'" <u>In re Winstar Commc'ns Sec. Litig.</u>, 290 F.R.D. 437, 445 (S.D.N.Y. 2013) (quoting <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 131 S. Ct. 2179, 2185, 180 L. Ed. 2d 24 (2011); <u>see also</u> <u>Maverick Fund, L.D.C. v. Comverse Tech., Inc.</u>, 801 F. Supp. 2d 41, 55 (E.D.N.Y. 2011) ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that, for liability to arise, the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury exists as a predicate for liability.") (quoting <u>Stoneridge Inv. Partners, LLC v. Scientific–Atlanta</u>, 552 U.S. 148, 159, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008)) (internal quotation marks omitted).

Besides the fact that the Plaintiffs all testified in their depositions that they solely relied on the statements of Sterling Foster's employees when deciding to purchase the ML Direct shares, the confirmations at issue here were sent to the Plaintiffs after the trades. As the Second Circuit ruled in Fezzani v. Bear Stearns & Co., Inc., 716 F.3d 18 (2d Cir. 2013) (hereinafter, "Fezzani II"), "[b]ecause confirmations came after trades were made, the price information was the result, not the cause, of the fraud." Id. at 23 n.4. Thus, the Plaintiffs here cannot argue that they were induced into entering into the trades due to the confirmations, because they did not receive the confirmations until after they entered into the trades. In other words, absence reliance, there is no connection between the misleading confirmations and the Plaintiffs' injuries.

For these reasons, the Court finds that the Plaintiffs' claim for misrepresentation or omission brought under § 10(b) of the Securities Exchange Act of 1934 fails as a matter of law. Therefore, the Court grants summary judgment in favor of the Defendants as to this cause of action.

**C. As to the Plaintiffs' New York State Common Law Claim for Aiding And Abetting Fraud**

The Plaintiffs' final remaining claim alleges that Bear Stearns aided and abetted Sterling Foster's fraud in violation of New York State common law. "To state a claim for aiding and abetting fraud [under New York law], [a] plaintiff must allege: '(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the fraud.'" Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC, 11 CIV. 2327 GBD, 2013 WL 1342529, at *10 (S.D.N.Y. Mar. 29, 2013) (quoting Nelson v. Publishers Circulation Fulfillment, Inc., No. 11 Civ. 1182(TPG), 2012 WL 760335, at *8 (S.D.N.Y. March 7, 2012)).

In this case, the parties agree that the first element is satisfied in that Sterling Foster committed the underlying fraud. As to the second element, the parties dispute whether Bear Stearns had knowledge of Sterling Foster's fraud. In fact, the Plaintiffs spend a significant portion of their motion and reply papers attempting to demonstrate that Bear Stearns was knowledgeable about Sterling Foster's fraudulent scheme based on Sterling Foster's fraudulent conduct in connection with previous IPOs and Bear Stearns' receipt of the Prospectus containing the lock-up agreement prior to the ML Direct IPO. However, the Court finds that whether or not Bear Stearns knew about the fraud is irrelevant, because the Plaintiffs cannot satisfy the third element of an aiding and abetting fraud claim, and thus, the claim must be dismissed as a matter of law.

The Second Circuit has made clear that "[t]he simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker." Greenberg v. Bear, Stearns & Co., 220 F.3d 22, 29 (2d Cir. 2000) (quoting Stander v. Financial Clearing & Servs. Corp., 730 F. Supp. 1282, 1286 (S.D.N.Y.1990)) (internal brackets omitted); see also S.E.C. v. Lee, 720 F. Supp. 2d 305, 330 (S.D.N.Y. 2010) ("[A] clearing broker does not provide 'substantial assistance' to or 'participate' in a fraud when it merely clears trades."). As such, because Bear Stearns was merely a clearing broker, it cannot be held liable for aiding and abetting fraud simply for performing routine clearing services for Sterling Foster.

Nevertheless, the Plaintiffs attempt to argue that Bear Stearns was not performing routine clearing services and point to the following alleged activities as evidence that Bear Stearns aided the fraudulent scheme perpetuated by Sterling Foster: (1) Bear Stearns' approval of the ML Direct underwriting; (2) Bear Stearns' failure to deliver the Prospectus during the twenty-five day period

following the IPO, as required by 17 C.F.R. § 230.174(d); (3) Bear Stearns' clearing of unregistered shares in violation of § 5 of the Securities Act of 1933; (4) Bear Stearns' sending of the misleading confirmations, discussed above; (5) Bear Stearns' refusal to sell-out the unpaid for ML Direct shares, as required by Regulation T, 12 C.F.R. § 220.8, thereby concealing the lack of demand for ML Direct stock and allowing the maintenance of a false market for ML Direct shares; and (6) Bear Stearns' approval and hiding of the "as of" shares and failure to report these purchases to NASDAQ, thereby concealing from the public the lower prices for ML Direct.

However, the Plaintiffs ignore the fact that in Levitt III, the Second Circuit considered substantially the same evidence that the Court has before it here and explicitly rejected many of the Plaintiffs' arguments that Bear Stearns performed activities that were irregular for a clearing broker. First, with respect to the fact that Bear Stearns' approved the ML Direct underwriting, the Second Circuit held:

> [The] Plaintiffs claim that Bear Stearns' requirement that it approve the ML Direct offering and its demand for a personal guarantee and increased collateral from Sterling Foster were unusual. They do not assert, however, that any of these requirements are atypical in the industry or, even if they are, that this would support the conclusion that Bear Stearns had a duty to disclose Sterling Foster's misconduct. To the contrary, Bear Stearns' expert testified that requirements for increased collateral and approval of large IPOs were standard among clearing brokers and represented an attempt to mitigate the clearing broker's risk. The Levitt Plaintiffs' allegations thus boil down to a claim that the demand for a personal guarantee and increased collateral are "irregular" in the context of Bear Stearns' alleged knowledge that Sterling Foster would attempt to manipulate the market in ML Direct shares by releasing the Selling Securityholders from the lock-up agreement after trading commenced. But . . . a clearing broker's knowledge of the fraud alone is an insufficient basis on which to impose a duty of disclosure on the clearing broker; we do not think otherwise-normal clearing practices become "irregular" simply because they are undertaken with such knowledge.

<u>Levitt III</u>, 710 F.3d at 468.

Concerning the misleading confirmations, as addressed above, the Second Circuit concluded that this was not an irregular activity and emphasized that "[t]his conduct standing alone [ ] does not constitute the sort of extraordinary high involvement in the fraudulent scheme necessary to create [ ] a duty[to disclose] on the part of Bear Stearns." <u>Id.</u> at 468–69. Importantly, "[i]n the absence of a fiduciary duty, which, again, [Bear Stearns did not have in this case], . . . inaction on the part of an affiliated entity is not sufficient to sustain a claim of aiding and abetting fraud." <u>Beach v. Citigroup Alternative Investments LLC</u>, 12 CIV. 7717 PKC, 2014 WL 904650, at *22 (S.D.N.Y. Mar. 7, 2014).

As to Bear Stearns' refusal to sell-out the unpaid for ML Direct shares, in violation of Regulation T, the Second Circuit stated "[e]ven if a clearing broker's violations of Regulation T are 'irregular,' [ ] they do not support he conclusion that the clearing broker has a duty to disclose a broker-dealer's misconduct to that broker-dealer's customers." <u>Levitt III</u>, 710 F.3d at 469. The Second Circuit reasoned:

> Regulation T . . . sets forth time periods for payment of customer purchases in a broker-dealer account. Regulation T provides that a broker-dealer shall promptly cancel or otherwise liquidate a transaction for which the customer has not made full cash payment within the required time. The Levitt Plaintiffs argue that Bear Stearns violated Regulation T when it failed to cancel unpaid trades in Sterling Foster accounts during the ML Direct IPO. We have held, however, that there is no private right of action under [Regulation T]
> Plaintiffs do not directly argue for a private cause of action for a clearing broker's Regulation T violation, but rather urge that Bear Stearns can be held liable as a primary violator of § 10(b) because its violations of Regulation T permitted Sterling Foster to manipulate the market for ML Direct by allowing trades to go unpaid until the Selling Securityholders delivered their shares. But,

in the absence of other conduct of Bear Stearns outside the normal course of activities for a clearing broker, deeming the violation of Regulation T to trigger a duty to disclose, and in so doing to constitute a material omission under § 10(b), would be tantamount to the creation of a right of action for a Regulation T violation. . . . [W]e decline to effectively adopt a private right of action for investors to enforce these regulations.

Id. at 470 (citations, internal quotation marks and ellipse omitted).

Although the Second Circuit was considering liability under § 10(b) of the Securities Exchange Act of 1934, the Court nonetheless finds that this reasoning clearly extends to an aiding and abetting fraud claim brought under New York State common law. Indeed, if the Plaintiffs were permitted to premise their aiding and abetting fraud claim on Regulation T, this Court would in essence be creating a right of action for a Regulation T violation through the vehicle of a New York State common law cause of action. This is contrary to the Second Circuit's holding in the Levitt III decision, which undoubtedly encourages the opposite outcome.

The Second Circuit also addressed the Plaintiffs' arguments concerning Bear Stearns' approval and hiding of the "as of" shares. In this regard, although the "Plaintiffs argue[d] that Bear Stearns went beyond merely serving as an ordinary clearing broker because Bear Stearns allowed Sterling Foster to resell repurchased shares from September 12 through September 30, 1996 as of September 4, at the share price prevailing on September 4, rather than on the date the shares were actually sold," the Second Circuit "fail[ed] to see how allowing or clearing putatively sham or manipulative trades is comparable to directing or instigating such trades[.]" Id. at 469 (citations, internal quotation marks and ellipse omitted). Hence, the Second Circuit rejected the Plaintiffs' argument that this could establish that Bear Stearns performed activities other than routine clearing services.

The Plaintiffs' last two arguments – concerning (1) Bear Stearns' failure to deliver the Prospectus during the twenty-five day period following the IPO, as required by 17 C.F.R. § 230.174(d); and (2) Bear Stearns' clearing of unregistered shares in violation of § 5 of the Securities Act of 1933 – were never addressed by the Second Circuit in <u>Levitt III</u>. Nevertheless, the Court holds that neither of these activities suggests that Bear Stearns' conduct was irregular for a clearing broker or demonstrates that Bear Stearns provided substantial assistance in the achievement of the Sterling Foster fraud.

First, as to Bear Stearn's failure to deliver the Prospectus during the twenty-five day period following the IPO, the Second Circuit in <u>Greenberg</u> ruled that clearing brokers like Bear Stearns have no obligation to comply with 17 C.F.R. § 230.174(d). F.3d at 29. Similar to the present action, the <u>Greenberg</u> case also involved allegations that Bear Stearns violated federal securities law and acted as an aider and abetter of fraud under New York common law in connection with Sterling Foster's fraudulent scheme. The Second Circuit held as follows:

> [The Plaintiff] contends that Bear Stearns failed to comply with 17 C.F.R. § 230.174, which requires delivery of a prospectus in connection with the sale of newly issued securities. But the regulation imposes this requirement only on underwriters and dealers, not on clearing brokers, and nothing in the agreement between Bear Stearns and Sterling Foster unambiguously shifted the burden of complying with this requirement onto Bear Stearns.

F.3d at 29.

Likewise, in this case, the evidence before the Court establishes that the arrangement between Sterling Foster and Bear Stearns was such that Bear Stearns only sent out the Prospectus to customers if directed by Sterling Foster to do so through an automated system. Thus, this demonstrates that it was Sterling Foster's responsibility to determine which customers were to

receive the Prospectus, and not Bear Stearns. As a consequence, in the Court's view, it would be inappropriate to impose liability onto Bear Stearns under New York common law for failing to comply with the requirement of 17 C.F.R. § 230.174 when it was clearly not obligated to do so.

The Plaintiffs' final contention rests on Bear Stearn's alleged illegal clearing of unregistered shares. In this regard, the Plaintiffs assert that "once Sterling Foster acquired the selling security holders' ML Direct shares, the registration for the shares terminated and Sterling Foster, having the controlling interest in ML Direct could not sell these shares without having another registration statement in effect." (Pl. Mem., pg. 14.) In making this argument, the Plaintiffs rely on the Second Circuit's decision in <u>SEC v. Cavanagh</u>, 155 F.3d 129 (2d Cir. 1998), in which the Second Circuit explained that pursuant to § 5 of the Securities Act of 1933, "[a] registration statement permits an issuer, or other persons, to make only the offers and sales described in the registration statement." <u>Id.</u> at 133. In this regard, "once a security has been sold pursuant to a registration statement, subsequent sales are not themselves sales for which a registration statement is in effect. Each sale of a security, then, must either be made pursuant to a registration statement or fall under a registration exemption." <u>Id.</u> (quoting Eddy J. Rogers, Jr. & Jason Weeden, <u>Resales of Securities Under the Securities Act</u>, 1012 PLI/Corp. 285, 287 (Sept. 1997)).

However, problematic for the Plaintiffs is that there is no private right of action under § 5 of the Securities Act of 1933. See <u>Desyatnikov v. Credit Suisse Grp., Inc.</u>, 10-CV-1870 DLI VVP, 2012 WL 1019990, at *5 (E.D.N.Y. Mar. 26, 2012) ("[T]here is no private right of action under Section 5."); <u>Ato Ram, II, Ltd. v. SMC Multimedia Corp.</u>, 03 CIV.5569 HB, 2004 WL 744792, at *5, n.5 (S.D.N.Y. Apr. 7, 2004). Rather, "[p]rivate civil liability for violations of [§] 5

exists only when the provisions of [§] 12 have been met." Zola v. Gordon, 685 F. Supp. 354, 359,

on reargument, 701 F. Supp. 66 (S.D.N.Y. 1988); see also Ato Ram, 2004 WL 744792, at *5.

"Section 12 specifies that '[a]ny person who (1) offers or sells a security in violation of

[Section 5] . . . shall be liable . . . to the person purchasing such security from him.'" S.E.C. v.

Boock, 09 CIV. 8261 DLC, 2011 WL 3792819, at *16 n.17 (S.D.N.Y. Aug. 25, 2011) (quoting 15

U.S.C. § 77l(a)) (emphasis, brackets and ellipses in original). With this in mind, in Pinter v. Dahl,

486 U.S. 622, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988), the Supreme Court held:

> There is no support in the statutory language or legislative history
> for expansion of § 12(1) primary liability beyond persons who pass
> title and persons who "offer," including those who "solicit" offers.
> Indeed, § 12's failure to impose express liability for mere
> participation in unlawful sales transactions suggests that Congress
> did not intend that the section impose liability on participants
> collateral to the offer or sale. When Congress wished to create such
> liability, it had little trouble doing so.

Id. at 650; see also In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167, 179–80 (2d

Cir. 2011).

In other words, "[a] plaintiff has standing to bring a Section 12 claim only against a

'statutory seller'" Perry v. Duoyuan Printing, Inc., 10 CIV. 7235 GBD, 2013 WL 4505199, at *12

(S.D.N.Y. Aug. 22, 2013) (quoting In re IndyMac Mortgage–Backed Sec. Litig., 718 F. Supp. 2d

495, 501–02 (S.D.N.Y. 2010)). "An individual qualifies as a 'statutory seller' if he: (1) 'passed

title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicited the

purchase of a security, motivated at least in part by a desire to serve his own financial interests or

those of the securities' owner.'" Id. (quoting Pinter, 486 U.S. at 642).

Nothing in the record before the Court indicates that Bear Stearns played any role in

soliciting the Plaintiffs to purchase the ML Direct shares or even had direct contact with Sterling

Foster's customers, including the Plaintiffs. In re Deutsche Telekom AG Sec. Litig., 00 CIV 9475 SHS, 2002 WL 244597, at *5 (S.D.N.Y. Feb. 20, 2002). Indeed, as discussed above, the evidence demonstrates that Sterling Foster solicited the sales, while Bear Stearns merely engaged in routine clearing activities. See, e.g., Sellin v. Rx Plus, Inc., 730 F. Supp. 1289, 1292 (S.D.N.Y. 1990) (quoting Wilson v. Saintine Exploration and Drilling Corp., 872 F.2d 1124 (2d Cir.1989)) ("[T]he firm's participation in the sale consisted solely of the ministerial act of mailing a copy of the private placement memorandum . . . . That cannot under any view be considered the kind of solicitation necessary under Pinter.") (internal brackets and ellipse in original).

Since Bear Stearns would not be liable under §§ 5 and 12 of the Securities Act of 1933, the Court finds that it would be inappropriate to impose liability for violating these sections under a New York State common law claim for aiding and abetting fraud. To do so would create a private right of action against collateral participants for violations of § 5, which is contrary to the Supreme Court's holding in Pinter. Therefore, for the same reasons the Court rejected Plaintiffs' attempt to premise its aiding and abetting fraud claim on Regulation T, the Court declines to allow the Plaintiffs to proceed with a cause of action for violations of § 5.

In sum, because the "substantial assistance" prong of an aiding and abetting fraud claim cannot be established by the evidence in this case, the Court grants summary judgment in favor of the Defendants on the Plaintiffs' New York State common law cause of action.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED,** that the Defendants' Fed. R. Civ. P. 56 motion for summary judgment is granted in its entirety; and it is further

**ORDERED,** that the Plaintiffs' Fed. R. Civ. P. 56 cross-motion for summary judgment is denied; and it is further

**ORDERED**, that all of the Plaintiffs' claims are dismissed; and it is further

**ORDERED**, that the Defendants are directed to serve a copy of this Order on all <u>pro se</u> parties in this case; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
March 24, 2014

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge